---

(Superior Court of Cincinnati, 1901.)
DANIEL L. LYON v. GEO. W. FELS.

---

1. Where a grant of a right of way is created in the following language "Also the full and entire right of way in, over, and upon a certain private alley twelve feet wide," which alley was owned by the grantor, and had been laid out by him between his lots. Held, that the grantor or those claiming under him have no right to erect a gate, or gates, at the entrance of the way, or to narrow the passage by gate posts.

2. It is the duty of the grantee of a right of way to keep the same in repair, and if he does not, the grantor cannot compel contribution from the grantee by himself making the repairs.

---

DEMPSEY, J.

The facts of this case, as deduced from a careful consideration of the pleadings and agreed statement of all of the parties as to certain record facts, and the evidence as to other disputed facts, are as follows: The petition in this case was filed January 12th, 1897. On the 22d day of January, 1897, and for some time subsequent thereto, Ernst H. King, who is now deceased, was the owner in absolute fee simple of a tract of land in the city of Cincinnati, which tract of land fronted 180 feet on the north side of Oak street and ran northwardly, between parallel lines, for depth 400 feet, and having a frontage on the easterly side of Highland avenue to the extent of said 400 feet. On the 21st day of May, 1868 the said Ernst H. King, by a deed recorded in book

356, at page 183, of the Hamilton county deed records, conveyed to Charles Moser, out of this 180 by 400 feet tract, a lot of ground at the south-east corner of the tract; the lot conveyed laid 136 feet east of Highland Ave. and was described as a lot fronting forty-five feet on the north side of Oak street, and extending back between lines parallel to Highland avenue, two hundred feet "to a private alley twelve feet wide." The granting clause of said deed also contained the following grant immediately following the description of the specific lot conveyed; "also the full and entire right of way in, over, and upon a certain private alley twelve (12) feet wide, situate and lying two hundred (200) feet north of and parallel to Oak street and extending eastwardly from Highland avenue one hundred and eighty (180) feet to the east line of said lot numbered two (2)."

The original tract consisted of parts of lots numbered one and two of William Burnet's subdivision, and "the east line of said lot numbered two" was in fact the east line of Ernst H. King's said tract.

On the said May 21st, 1868, Ernest King, by his deed recorded in Book 356, at page 181, of the deed records of said Hamilton county, also conveyed to George Hoffman a lot lying immediately west of said lot conveyed to said Charles Moser; this lot was described as forty-five feet in front on the north side of Oak street, commencing ninety (90) feet east of Highland avenue, and extending back between lines parallel to Highland avenue, two hundred feet, "to a private alley twelve feet wide." The granting clause of the deed also contained a grant of a right of way in the exact language used in the deed to Charles Moser. In May 1878, Ernest H. King died, leaving a will, which was duly probated, whereby he granted unto Eliza King, his executrix, full power to sell any or all of his real estate, at private or public sale at such terms as she might deem best, and to give to the purchaser a good and sufficient deed for the same, in the same manner and to the same extent as he could do if she died before him, giving her full power and control of the premises, no act of hers to be called into question.

On the 6th day of May, 1879, Eliza King, as Executrix of Ernest H. King, conveyed to John H. King, a lot at the northeast corner of Oak street and Highland avenue, being 47 feet front on Oak street; "thence north on the east line of Highland avenue, 200 feet to an alley; thence east with the *south line of said*

*alley* 47 feet;" and thence south 200 feet to Oak street. Except as contained in the description of the lot there is no reference to said alley, nor any special grant of a right of way in said alley as in the Moser and Hoffman deeds. On this 20th day of July, 1882, Eliza King, as Executrix of Ernest H. King, by her deed recorded in Book 534, at page 574, of the deed records of Hamilton county, conveyed to John V. Nicholai a lot of ground 74 feet on the east side of Highland avenue, and exten·'ing eastwardly between lines parallel to Oak street 180 feet in depth, and lying 200 feet north of Oak street. The granting clause of this deed contained the following condition or exception to the grant: That said premises hereby conveyed being subject to a twelve (12) foot private alley to be taken off the south side of the said premises, as created and provided for by said King in his life time by deeds in Book 356, pages 181 and 183 of the records aforesaid, *which twelve (12) foot private alley is to be for the use of all the lots abutting thereon,* and said Nicholai agrees to give five (5) feet off the east end of said above described premises for the purpose of another private alley, as soon as the adjoining owner on the east gives five (5) feet off his premises for the same purpose."

The lot conveyed to Charles Moser, is now owned by Daniel L. Lyon, the plaintiff herein, ·he deed to him and the intermediate conveyances between him and Moser, containing a grant of right of way in the identical language used in Ernest H. King's deed to Moser. The Hoffman lot is now owned by his widow and devisees; the 43 feet front on Oak street lying between Hoffman's lot and the corner lot sold to John H. King is still owned by the devisees of Ernest H. King; the John H. King lot at the corner of Oak street and Highland avenue is now owned by his widow and heirs; the Nicolai lot on Highland avenue is now owned by George W. Fels, who acquired it September, 15th, 1890, under a conveyance which contained the following recital: "The said premises being subject to a twelve (12) foot private alley to be taken off the south side as created, and provided for by deed in Book 356, pages 181 and 183." The alley way to its full length of 180 feet and its full width of 12 feet has been for over 26 years defined and marked by buildings, fences and walls on both the north and south sides. At the rear of Lyon's and Hoffman's lots, and marking the south line of the alley, stables are still standing which were erected over 26 years ago as is also a carpenter shop in the rear of Fels' lot, erected 25 years ago, and which marks the north line of the alley. Ever since the grievances complained of

in this case and mentioned hereinafter the alley had remained continuallly open at Highland avenue and without any bars or gate to obstruct or impede entrance and exit.

During all of this time also, there were gutters in the alley into which the rain water from the roofs of the outbuildings, the surface water from the back yards of the Oak street houses, and probably the waste water from the kitchens and sinks of the Oak street houses, was wont to flow and run off into

Some question is made by the eivdence as to the extent that it was used, or could be used, with convenience, by horses and vehicles; but in the view that I have taken of the legal questions raised, I do not think it is material to the case one way or another whether it could be used by or for horses or not. Somewhere between 1890 and 1895, the exact time the evidence does not disclose, the city of Cincinnati improved Highland avenue by sewering it, and also by lowering the grade, and curbing and paving the street. One consequence of this improvement was that the level of the pavement of Highland avenue at the street gutters was made considerably lower than the level of the private alley way; in addition to this, there is evidence on the part of Dr. Fels that the condition of the alley way itself became objectionable because of the alley becoming clogged up, and the way became in other respects out of repair, and, as he claims, obstructed On his own motion and without any notice to the other owners, Dr. Fels proceeded to repair and improve the alley way and to put it into good and serviceable condition. For this at various times he expended, in the aggregate, the sum of $265.28.

After the sewering of Highland Avenue, the two King families desired to connect their Oak street houses, especially their closets and lavatories, with the Avenue sewer; in order to do this with convenience to themselves, it was their intention to make this connection through this private alley way by means of sewer pipe laid therein to Highland avenue. This Dr. Fels refused to let them do, and he has persisted and still persists in refusing to let them do this On the 20th day of November, 1895, Dr. Fels erected at and across the entrance of the alley way on Highland avenue iron posts and swinging iron gates, and is now still maintaining the same there. These gates are about three feet in height, swing inwardly and are kept closed by a drop bolt at the bottom and a spring latch near the top. They are hung to the iron posts, which posts, with their projections, extend into said alley way 16 inches from the south side and 13 inches from the north

side, and leave when opened a clear space or opening of only nine feet, seven inches. Any one approaching said gates in a vehicle must alight and unlatch and unbolt said gates before access can be had to the alley. The gates themselves are composed of upright pieces of iron, arranged some three inches apart, so as not to obstruct the view of persons passing in front or rear thereof. The gates are never locked, nor are the bolt and latch arrangements intended for any purpose other than to keep the gates closed when in position and to prevent them from swinging to and fro. No objection is made by any of the parties to the material of which the gates are composed, to their design, nor that they are not suitable for the purposes intended by Dr. Fels, nor that they are not in keeping with the surroundings, nor that they obscure light and air. Dr. Fels disclaims any intention, in the erection of said gates, of encroachng upon or prejudicing any rights of the other property owners in said alley way, but testifies that he erected them to preserve himself and family from annoyance by unruly boys, lewd persons and stray animals who were in the habit of infesting said alley way.

It was also admitted on the trial that a fence separating said alley way from Dr. Fels' homestead lot proper encroaches on said alley way some two or three inches. The relief sought by plaintiff herein is against Dr. Fels alone, the other defendants having been joined as such because of their interest in the subject of the controversy. The relief sought is first a mandatory injunction compelling said Fels to remove said gates, post and fence, and, in addition, a perpetual injunction from hereafter erecting or maintaining the same or other barriers at the entrance of said alleyway, or from encroaching thereon in any manner. Excluding Fels, all the other defendants join in the prayer of plaintiff's petition, and in addition pray the court to determine their rights as to the uses by them of this alleyway, especial reference being had to the aforesaid alleged right of a house sewer connection through the alleyway. Dr. Fels files two answers and cross petitions, in which he denies the rights and claims of the other parties to the case especially the claim of sewerage rights; he, also, claims to recover from the other parties to the case their relative proportions of the $265.28 expended by him in the repair and improvement of the alleyway. He also avers that the buildings on Lyon's lot encroach 2¾ inches on the alleyway; that the buildings on the Hoffman lot encroach 8⅝ inches on the alleyway; that the buildings on the Ernst H. King lot encroach 8⅝ inches on the alleyway,

and he prays relief against them accordingly; as to these averments it is sufficient to say that no evidence at all was offered to support them; consequently, they fail for want of proof, and as to them the cross petitions of Fels may be dismissed

Three questions are presented by the facts, viz. (1) The extent of the right of way involved in this case, including the question of the right to obstruct the way by gates and posts; (2) the right to use the alleyway for purposes of sewerage; and (3) Fels' right to reimbursement for his outlay for repairs and improvements. As to the extent of the right of way, the solution of this question is wholly a matter of construction, as the way in controversy in this case had its origin in the grants thereof contained in the deeds to Moser and Hoffman, supra, which were subsequently confirmed and ratified for the benefit of all of the abutting property owners by the deed of Nicolai. The way having been granted and created by deed, the rights of the parties, all parties, must be ascertained from the words of the deed; Fels' rights are to be determined by the true construction of the grants to Moser and Hoffman, for Fels claims under Nicolai who took title subject to the rights of Moser and Hoffman. Now, while the general rule is that the extent of the easement cannot be determined from any other source than the deed creating it, yet this rule is subject to the modification that surrounding circumstances may be taken into consideration in order to ascertain the intention of the partes; in other words, evidence may be introduced to show the situation and condition of the easement and properties involved, the use made of the way, what obstructions, if any, existed at the time of the grant, and all other facts bearing upon the situation and relation of the parties in order to determine what was granted by one party and received by the other. The object is to apply the grant to the subject matter as the parties intended it.

In the case at bar no great objection is made by counsel for Dr. Fels as to the limits and dimensions of the way granted to plaintiff and the other defendants, although the admission is made that his homestead fence does encroach upon the north side of the alley; the main contention is as to the mode or manner in which the plaintiff and Fels' co-defendants are entitled to use this way; whether they are entitled to an open, free and unobstructed passage, or whether Fels can maintain gates at the entrance of the way. As to the limits of the grant, it seems to me there can exist no difficulty, under the facts of this case, in ascertaining them. The language of the grants them-

selves could not be plainer or clearer; but we do not have to depend upon the grants alone, for the circumstances surrounding the parties and alley way at the time of the grants are strong and irresistible confimation of what the wording of the grants themselves expresses.

When these grants are read in connection with the use of the way, the buildings, permanent erections, on the south side, and the fences, and carpenter shop on the north side, that is when the words used by the grantor in creating this way are read in conjunction with his acts in locating and bounding the way, all being open and notorious to the grantees the deduction is conclusive that the limits of this way were to be the exact limits of the strip of land over which the way was created, that is 12 feet wide and 180 feet long clear through to the east line of Ernst H. King's tract of land. When we come to consider the other questions, however, as to what if any restrictions or limitations can be placed by the land owner upon the use of the way, especially by way of gates and bars, there does appear to be some confusion at first sight in the principles laid down in the text books. Various rules are laid down as to the right, under various conditions, on the part of the land owner, to use gates and bars at the termini or in the center of the way; but an examination of the cases will show that inflexible rules of law cannot and are not sought to be laid down applicable to this question, but that each case is decided on its own circumstances and under the general rule of construction invoked above.

Herein, we think lies the fallacy of the arguments of Dr. Fels' counsel when he insists that the land owner, as land owner, has the right per se to use gates at either terminus of the right of way; for the rights of the land owner are to be ascertained by a true construction of his own grant as much as those of the way owner. It is true that there are cases which apparently say that it is the right of a servient owner to erect gates at the termini of the way; but consideration of them shows that the ways in most of them were founded on general grants, express or implied, and that the courts in construing such grants limited the rights granted to what is designated a reasonable use of the land over which the way was granted, and that gates and bars, under certain conditions, were not an infringement of such reasonable use. But, in America, at least, as regards both the extent of way and the mode of user, the rule has been established that if the way granted is defined by metes and bounds, or described as of a given width, or otherwise defined, the grantor cannot subsequently narrow the way even though he should leave a sufficient width for all of the actual uses of the grantee.

The leading cases to be found on this point are in Massachusetts where the question has been under considerable discussion. Thus, in *Saulsbury v. Andrews,* 19 Pickering, 250, the court held that "the language of a deed may be modified or effect given to particular provisions by the state of things at the time upon which it is to operate;" and, at page 258, the court say that a "right to pass and repass over vacant and unoccupied land when no way actually exists or is used, would be the grant of a convenient way the direction and width of which would be determined by various circumstances. But similar words being used in regard to a place over which a way is already fixed by buildings or permanent enclosures would be construed to be a grant of the same way thus located, fixed and defined. *Such a construction is necessary to the security of both parties.*' To the grantee to insure him a way of known width and dimensions, the sufficiency of which he may judge of before he closes his contract of purchase; and to the grantor to secure himself against the claim of the grantee to indefinite right to pass over his premises."

In *Tudor Ice Co. v. Cunningham,* 8 Allen, 139, there was a grant of a right of way with horses, carts and other vehicles "to a street 40 feet wide and in, over and through said 40 feet street," language very similar to the language of the grants in the case at bar; and the circumstances in other respects were alike, for this 40 feet street was owned by the grantor and had been laid out by him between his lots, and was so situated that there would be much passing over the same. It was held that the grant in this case gave a right of way in the entire space, forty feet in width; and Bigelow, C. J., in announcing the opinion of the court discusses the question as follows: "The nature and extent of this right are fully described in the deed under which plaintiffs claim. It is in, over and through a 40 foot street; that is a right of way of that width, for all the ordinary and usual purposes and uses of a street; and *free from all hindrances, incumbrances and impediments,* except those which are commonly or necessarily incident to its enjoyment by others, having a right to a similar easement in the same strip of land. The grant of such a right is to be construed with reference to the place in which it is created and the circumstances under which the grant was made."

And in *Welch* v. *Wilcox*, 101 Mass. 162, it was held that the owner of land over which a right of way "as now laid out" had been granted, has no right in the absence of evidence of a contrary usage to erect a gate at the entrance of the way or to narrow the passage by gate-posts. The facts showed that at the time of the conveyance of the right of way, there was no gate upon the passage way, and it was open to the public street. The plaintiff was the land owner, the defendant the way owner; the right of way was created in 1858. In 1866, plaintiff against defendant's protest erected a gate at the end of the passage way on the street; this gate had a common thumb latch and was without any other fastening; the gate hung and opened inside in the passage way, and when opened it together with the upright on the opposite side narrowed out the passage way, and the gate was a suitable one if plaintiff had a right to erect it and to narrow the passage way. Defendant removed the gate, which was the tort complained of. Many of the facts of the case, as is seen, are similar to the case at bar. Colt, J., in affirming a judgment for defendant says: "It does not appear in what manner the way was laid out, but we must infer that it was by some well marked boundaries known and recognized by both parties. There was no gate separating the passage way from the street at the time of these conveyances, and in the opinion of the court, the plaintiff has no right to erect and maintain a gate at the entrance of said passage way, or to narrow the way as described."

The learned judge then distinguished the case from *Atkins* v *Boardman*, 2 Met. 457, by stating that the doctrine of that case is that, "when no actually existing way, as bounded and located, is granted or reserved, the way in point of width and height shall be such as is reasonably necessary and convenient for the purpose for which it is granted" and it was held in *Atkins* v. *Boardman* that the dimensions of the particular way in controversy were not expressed, and hence they were to be controlled by the purpose for which the way was reserved. But, continues Colt, J., reiterating the doctrine of *Saulsbury* v. *Andrews*, supra, "when the way is defined, the construction must be such as is necessary to the security of both parties. To the grantee to insure him a way of known width and dimensions," etc.

The doctrine of these Massachusetts cases is quoted with approval in Bennett's Goddard on Easements, pp. 333-337, and also in Washburne on Easements, p. 256, and appeals to the mind of the court as being founded in reason and good sense. Nor, on reflection, will it appear that the rule established by these cases as to fixed, defined and ascertained rights of way is any departure from or exception to the general rule which requires that the extent of the way granted is to be determined by the terms of the grant read in connection with the circumstances surrounding the parties and the subject of the grant at the time it was made; if anything, they are emphatic illustrations of the general rule. And that was the interpretation placed upon them by the supreme court of Masschusetts in *Short* v. *Devine*, 146 Mass. page 119, where all the previous cases are reviewed, and in which case, at page 124, the court say "the right of the defendant to erect gates must depend upon the facts and circumstances", and again at page 126, "A person over whose land there is a right of way will or will not have a right to maintain gates at the ends of the way according to circumstances"; thus, in reality, bringing us back to the general fundamental rule, applicable alike to the limits and dimensions of the way, and the manner of its user by the grantee. It would serve no useful purpose in view of the general statement of facts hereinbefore made for me to detail them again here at length in order to justify the conclusion arrived at by me in the application of this general rule of law governing the construction of grants of rights of way as I understand the rule to be from an examination of the books and decisions. It will be sufficient to say that under the facts and law as I find it to be, I can come to no other conclusion than that the grantees of the right of way here in controversy are entitled to that right of way 12 feet wide and extending from Highland Ave. east 180 feet to the east line of Ernst H. King's original lot, and free from hindrances, impediments and incumbrances, and consequently that Dr. Fels had no right to encroach on said right of way by the gates and posts erected by him or by the overlap of his fence on the north side of the way.

A question was made on the trial as to whether the heirs of John H. King had any right in this way, there being no specific grant to said King of any interest in the right of way. Whatever might be the determination if the question turned on the rights derived under John H. King's deed, there certainly can be no doubt about the rights of said King heirs when those rights are considered as arising under the deed to Nicolai, the same source of title under which Fels claims.

When Nicolai accepted title under this deed from Mrs. King, as executrix, he consented that she should reserve and except from the title conveyed to him a right of way in this alley indentical with the right conveyed to Moser and Hoffman, which excepted and reserved right of way was to be for the use of all the abutting owners; the John H. King heirs are entitled, as against Nicolai, to the benefit of this reservation, and, as a consequence, also against Fels who gets only Nicolai's rights and no more.

The right to use the alley way for purposes of sewerage. Counsel for all of the defendants except Dr. Fels contends that his clients have the right to use this alley way for drainage because it was so used at the time of the grant, since then, and when Fels purchased; and he contends that this drainage included, (a) all the surface water in the upper yards; (b) all the hydrant water from the kitchens and houses; (c) all the roof water of the houses and stables; (d) all the drainage in any and all ways necessituated from the properties; and (e) all the sewerage from the houses. Counsel for Dr. Fels concedes the right to use the alley for the purpose of carrying off the water from the down spouts on the stables, but denies their right to alter the location of the present gutters, or to sink them into the ground, or to use them for the purpose of general sewerage. Whatever right of drainage these defendants had is founded on an implied grant as to all of them except the devisees of Ernest H. King, in whose case it is founded on an implied reservation which is equivalent to an implied grant. There being no actual grant in existence the extent of the right conferred and the proper mode of enjoyment must be determined by a consideration of all of the circumstances existing at the time of the implied grant or reservation in connection with the accustomed user of the righ claimed. The user is evidence of the intention of the parties. In the construction of express grants, only such rights are given as are within the contemplation of the parties, and within the terms of the grant. Certainly, no more liberal rule can be asked for implied grants. The extent of the rule is purely a matter of fact to be determined from the evidence, and when it is once determined what was the extent and nature of the right conferred at the time of the implied grant there can be no material enlargement of that right afterwards. The parties must be limited to matters as they stood at the time of the implied grant. Applying these principles to the facts as I find them from the evidence,

my conclusion is that these defendants have a right of drainage for the roofs of the out buildings, the surface water from the yards, the waste water from the kitchens and sinks, and possibly, although the evidence is not clear upon that point, the rain water from the roofs of the residence houses, but I am clear in the opinion that they have no right of general sewerage through that alley; in other words, they cannot be permitted to drain their cesspools, waterclosets, bath rooms and lavatories through that alley into the Highland avenue sewer. See *McCabe* v. *Hood,* 13 C. C. 621

Dr. Fels' right to reinbursement for his outlay for repairs and improvements.

This has been a most difficult question to solve. On principles of abstract justice it would seem to be no more than right that where a burden common to many has been assumed by one, all the others should contribute to make that one whole

As regards this alley way, Dr Feds occupies a dual position,—he is the owner of the reversion and he is also a tenant in common, as it were, in the ownership of the right of way. Considered as the owner of the reversion, there was no duty incumbent upon him to keep the way in repair; if it became so utterly out of repair as to be a source of danger or destruction to his reversionary estate, he had his right of action to recover damage for the injury sustained, and in a proper case, to enjoin any threatened irreparable injury to that estate. But as a reversioner, there being no duty incumbent upon him to repair the dominant estate, if he undertook such a duty it would be at his own risk and expense. Viewing him and his rights as a tenant in common of this right of way, the law appears to be in a very unsatisfactory state. It has been a mooted question of the common law how far persons jointly interested in incorporeal estate are bound to contribute to their preservation or restoration. In the ancient law there was a writ known as the writ reparatione faciende whereby persons were compelled to contribute to the repair and preservation of houses, bridges and mills, because these were thought to be matters of public utility. Afterwards a writ of trespass on the case was allowed to recover contributions for the same purpose, but it was never extended beyond houses, bridges, and mills.

The question was discussed in the case of *Doane* v. *Badger,* 12 Mass. 65,—and there it was held that a tenant in common was bound to contribute to the expense of repairs necessary for the preservation of the estate,

and that his co-tenant might have an action on the case against him for refusing, if such co-tenant shall have first notified him of such repair being necessary and requested him to join in making them

The question came under consideration again in *Calvert* v. *Aldrich*, 19 Mass., 78, in which case the supreme court in effect repudiate *Doane* v. *Badger,* and hold that in the absence of any express agreement, neither in England nor in America can an action at law be sustained either for contribution or for damages, after one has made needful repairs in which the other refused to join, and the court say the natural and adequate remedy is by partition. But such a remedy would not meet cases in which partition could not from the nature of the estate be made. In England the question arose in *Leigh* v. *Dickson*, 12 Q. B. D. 194, and all causes, American and English, are reviewed, and they denied the right of recovery existed save in case of such repairs as are necessary to preserve the estate from destruction or decay. Giving Dr. Fels the benefit of the most liberal rule, viz, the one in *Doane* v. *Badger,* supra, still the evidence does not bring him within its protecting provisions; for, there is no evidence of request on his part to the other co-tenants to join with him in the repairs, nor any notice to them that the way was out of repair or that he intended to repair it, and there is certainly no evidence that the way was going to destruction or decay. Hence, I am compelled to deny to him contribution from his co-owners of this way for his expenditures thereon.

As to the decree in the case counsel will have to frame that in accordance with the views and conclusions expressed in this opinion. As to the gates and posts and overlapping fence, a mandatory injunction will issue against Dr. Fels commanding him to remove them and enjoining their continuance hereafter. See *Harrison* v. *Creighead,* 4 W. L. B., 500 and 5 W. L. B., 270; also, *Harrison* v. *Pike,* 4 W. L. B., 156, all decisions by this court. Whether any further affirmative relief ought to be decreed against him, or against his co-defendant on the sewerage question is doubtful; in the case of Dr. Fels, he disclaims expressly any intention to question or dispute the right of plaintiffs and his co-defendants to the alley way, and in the sewage question no specific relief is asked by cross complainants. To secure, however, a final settlement of all dispute that might arise it is probably better that the decree find the rights of all parties hereto in the alley way on the questions presented, and that appro-priate orders be made finding those rigths once for all.

On Dr. Fels' counter-claim for contribution the finding and judgment will be against him.

*J. Chandler* and *Alfred Allen,* Counsel for plaintiff.

*Cobb & Howard,* Counsel for Dr. Fels.

*W. G. Williams,* Counsel for cross Complainants.